FILED IN UNITED STATES DISTRICT
COURT, DISTRICT OF UTAH

**IN THE UNITED STATES DISTRICT COURT**

ﬁﬀ - 5 2011

**DISTRICT OF UTAH, CENTRAL DIVISION** D. MARK JONES, CLERK
BY_____
DEPUTY CLERK

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **REPORT AND RECOMMENDATIONS** |
| **Plaintiff,** | : | |
| | | **Case No. 2:10-CR-00926-TS** |
| **vs.** | : | |
| **BRETT DANNY SHUMWAY,** | : | |
| **Defendant.** | | |

Before the Court are Motions to Suppress Evidence and Statements submitted by

Defendant Brett Danny Shumway. (File Entry Nos. 43 & 44). After thorough review and

consideration of the testimony and evidence presented at the evidentiary hearing and the parties'

pleadings, the Court recommends that Defendant's Motions to Suppress be **DENIED.**

## FACTUAL BACKGROUND

Late in the morning of September 22, 2010, police dispatch advised officers that a man

robbed Beehive Credit Union in St. George with a hand gun. (Transcript of 3/2/2011 Evidentiary

Hearing at 7-8.) Dispatch relayed limited–and somewhat conflicting–suspect information: a

black or dark-skinned male armed with a handgun and wearing a blue plaid shirt or a white shirt

that might be stained with exploding dye pack-ink.[1]  (Id. at 12-13.)

Within minutes of the radio call, Officer Seth Lefevre positioned his patrol car at Exit 6 on Interstate-15. (Id. at 7, 9-10.) Ramp and freeway traffic in the area were light and, due to road construction, slow-moving. (Id. at 11.) Under these conditions, Officer Lefevre observed traffic entering the freeway and looked carefully at the drivers and front passengers of cars as they passed. (Id. at 12.)

A silver Dodge Stratus entering the freeway on-ramp at Exit 6 caught Officer Lefevre's attention. (Id.) Both occupants of the car wore shirts consistent with the suspect description: the driver–a white male–wore a white shirt with some sort of discoloration on the front; the passenger–a dark-skinned male–wore a dark-colored shirt. (Id. at 13.)

Both the driver and passenger appeared nervous, and Officer Lefevre described their reaction to his presence as being different than the general motoring public: "They kind of had that, 'oh-my-gosh-I'm-caught' look. Their mouths were open. They stared at me for a longer amount of time than most people do as they pass a police officer, I would say at least three seconds . . . it was a long, cold, hard stare." (Id. at 14.) Then, as the subjects passed, both awkwardly averted their gaze, suddenly ignoring the officer and staring directly ahead. (Id. at 16.)

Officer Lefevre noted that the elapsed time between the initial report and seeing the Stratus enter the freeway was consistent with the time it would take to drive from the scene of the robbery to Exit 6 at that time of day. (Id. at 16, 19-20.) Officer Lefevre elected to follow the subjects onto the freeway, positioning his patrol car directly behind their car. (Id. at 16-17.)

---

[1] Officer Lefevre testified that dispatch described the suspect as a black or dark-skinned male. On cross-examination, however, the officer could not recall with certainty whether the initial description specified the suspect's gender. Id. at 35.

The subjects fixated on Officer Lefevre. The passenger physically turned his head to look over his shoulder at the officer every few seconds, while the driver checked his mirrors constantly. (Id. at 17.) Their behavior was highly unusual; Officer Lefevre described their actions as giving the appearance of being "paranoid," far different than most people who note his presence behind their vehicle. (Id. at 19.) Officer Lefevre also observed the driver made four unusual, seemingly unnecessary lane changes in a short, two-mile distance. (Id. at 18, 22, 42.)

As he followed the car, Officer Lefevre watched the passenger remove his dark-colored shirt and discard it in the backseat. (Id. at 18, 41, 47.) He found this highly suspicious because "that shirt was part of the description of the possible suspect and to me it looked like he was almost distancing himself away from possible evidence of a crime." (Id. at 18.)

Officer Lefevre initiated a traffic stop to "investigate the situation further." (Id. at 20-21.) Numerous observations during his initial approach gave Officer Lefevre safety concerns: both occupants physically turned their heads and watched him approach; both sweated profusely and breathed heavily; and the officer saw a dark blue plaid shirt, consistent with the robbery suspect description, on the backseat. (Id. at 23-25.)

The officer contacted the driver, defendant Shumway, asked for his driver's license, and inquired as to where the subjects had been recently. (Id. at 25.) Defendant responded unusually: "he immediately pointed to the passenger and said 'I don't know this guy. I just picked him up from the Golden Corral.'" (Id.) Officer Lefevre found Shumway's response "really strange" and noted it indicated the subjects had been "right close to the bank," given Golden Corral's close proximity to Beehive Credit Union. (Id. at 25-26.) Officer Lefevre asked the passenger for his name and asked Shumway why he would allow someone he didn't know to get into his car. (Id. at 26-27.) Shumway then stated that he picked up the passenger near the college, which

-3-

conflicted with his previous statement. (Id. at 27.)

At some point during the stop Officer Lefevre asked the subjects to keep their hands up, near the car roof, and they initially complied. (Id. at 27.) As the traffic stop progressed, however, the subjects put their hands down toward their pockets. Officer Lefevre ordered them to keep their hands up, but the passenger continued to lower his hands near his pockets. (Id. at 28.) The officer drew his gun and requested backup units to expedite their response. (Id.) He noted both subjects tried to look toward the backseat of the car, which caused him concern about a weapon. (Id. at 28-29.) As backup arrived, Officer Lefevre saw Shumway move his left hand near the door handle as if he were going to open the door; the officer put one hand against the door to hinder any effort to escape. (Id. at 29.)

Officer Lefevre asked assisting officers to check the passenger for weapons. (Id. at 30.) As assisting officers frisked the passenger, Shumway leaned toward Officer Lefevre and whispered something to the effect that, "this guy must have done something wrong, he's acting really weird." (Id. at 30.) Assisting officers told Lefevre they found a white mask with dye stains in the passenger's waistband or on his person. (Id. at 30-31.) As those officers placed the passenger in handcuffs, Officer Lefevre saw Shumway look over his shoulder, behind his seat toward the floor. (Id. at 31.) Officer Lefevre responded by asking Shumway if there were any weapons in the vehicle; defendant said there were no weapons and consented to the officer's request for permission to search the car. (Id.) Officer Lefevre immediately opened the rear driver-side door to search the area where Shumway had been looking and found a black handgun. (Id. at 32.) The gun had a bullet in the chamber; the officer unloaded and secured the gun in his patrol car before handcuffing Shumway. (Id.) Officer Lefevre later learned that Shumway's vehicle registration was expired. (Id. at 33-34, 43.)

-4-

Detective Josh Wilson responded to Officer Lefevre's request for assistance and arrived to find several other officers on scene. (Id. at 52.) Shumway was handcuffed and seated in a patrol car; officers handcuffed and searched the passenger, placing items found on the hood of a car. (Id. at 52-54.) Officers informed Detective Wilson that Lefevre found a gun in the car pursuant to a consent search and that a mask had been found in the passenger's pants. (Id. at 53.) Detective Wilson described the mask as made from a white, cotton tank top with a knot at the top and eye holes cut out. (Id.)

Detective Wilson asked to speak with the driver, defendant Shumway. (Id. at 54.) Detective Wilson first asked Shumway for permission to search his car and Shumway consented. (Id.) He then advised Shumway of his rights, and Shumway agreed to answer questions without an attorney present. (Id. at 54-55.)

During the roadside interview, Shumway claimed he gave a ride to his passenger after picking him up near Dixie College about an hour before. (Id. at 55.) Shumway said he did not know the passenger and that he only agreed to give him a ride to the nearby Bloomington area. (Id.) Shumway failed to provide a precise location where he was taking his passenger and was unresponsive when asked what he and the passenger had been doing during their hour together. (Id.) Detective Wilson terminated the interview and collected various items of evidence at the scene–including a blue plaid shirt, cellular phones, and the mask. (Id. at 56.)

Later that day, Detective Wilson interviewed Shumway with assistance from FBI Special Agent Seth Footlik. (Id. at 56-57.) The interview began at approximately 12:15pm and was recorded on video at the St. George Police Station. (Recording entered in evidence as Plaintiff's Exhibit 1-A.) As the interview began, Detective Wilson again advised Shumway of his rights under Miranda. (Id. at 12:16.) Shumway requested to speak with an attorney or with his sister,

Rachelle Elhert, who is employed as an attorney with the Washington County Attorney's Office. (Id.) Detective Wilson then asked questions regarding Shumway's current address, how long he had lived there, and so forth.[2] (Id. at 12:17-18.)

Shumway again requested an attorney, and as the investigators prepared to terminate the interview, Agent Footlik advised that, should he change his mind and wish to talk further, Shumway merely needed to ask to see them and they would gladly return. (Id. at 12:19.) Before the investigators left the room, Shumway asked "hypothetically" what would happen if he changed his mind and chose to talk further. (Id.) Agent Footlik clarified, asking Shumway if he was suggesting he did, in fact, want to talk more and Shumway replied, "Okay, I'll talk to you." (Id. at 12:20.) The interview briefly resumed before Shumway again asked for an attorney; investigators promptly terminated the interview with another reminder that, should he change his mind, Shumway need only ask to speak with them again and they would return. (Id. at 12:24.)

Approximately eight minutes later, St. George Police Captain Barry Golding entered the room and had a one-minute conversation with Shumway. (Id. at 12:33-34.) Captain Golding advised Shumway that he knows–and is good friends with–Shumway's sister, Rachelle, and asked if Shumway was willing to talk to her. (Id.) Shumway replied, "Yeah, I want to talk to her." (Id.) Captain Golding then clarified the nature of the visit he would allow: "I'll let her explain to you – Where you're potentially being prosecuted by her office, I don't think she can get involved in representing you." (Id.) Shumway responded, "Right, and I don't want her to

<hr />

[2] At the 12:18:51 mark in the video, Detective Wilson says, "You told me once that you didn't know Kris, you just picked him up by the college," and Shumway immediately replied, "I'm not saying nothing, man, just get me an attorney." The government conceded that this statement by Detective Wilson would not have lead to admissible evidence (had defendant given an incriminating response) because defendant had already requested to speak with an attorney. Defendant did not, however, give an incriminating response to the statement.

represent me." (Id.) Captain Golding repeated, "You just want to talk to her?" and Shumway replied, "Yeah." (Id.) Captain Golding then verified Shumway had invoked his right to counsel and asked Shumway to clarify where he currently lives before leaving the room. (Id.)

Less than ten minutes passed before Shumway's sister arrived and entered the room. (Id. at 12:42.) Within twenty seconds of Rachelle's arrival, Shumway started to discuss his situation before stating, "I don't want to talk about it." (Id.) Rachelle replied, "Then don't tell me anything about it." (Id.) Shumway ignored her warning and proceeded to discuss the facts surrounding his arrest; two minutes after her arrival Rachelle told Shumway, "They are recording" and "They've got video and audio in here." (Id. at 12:44.) Shumway then denied culpability, and Rachelle informed him that she didn't know any details about the allegations. (Id.)

Shumway continued to discuss the case with Rachelle, who caught herself and cautioned, "Well, don't even tell me anything." (Id. at 12:44-45.) Shumway nevertheless persisted in explaining to Rachelle why he was in town and why he felt there was no evidence to hold him. (Id. at 12:45-50.) Rachelle again advised that the conversation was being recorded and that she was visiting him only in her capacity as his sister and only by way of a favor from the investigators. (Id. at 12:50-51.) Shumway ignored her warnings and continued to make incriminating statements. Shumway also threatened suicide and suggested his wife, Roseanne, would do likewise when she learned of his arrest. (Id. at 12:51, 13:00, 13:04.) When Shumway later stated, "I'm fucked," Rachelle suggested that there are some good local attorneys and he can wait to see what happens. (Id. 13:02-03.) During the conversation, Shumway hinted repeatedly at committing suicide. (Id. at 13:03-04.) Rachelle encouraged him to "hang in there," to "look at the evidence and get an attorney and see where it goes," and to not "do anything drastic right

-7-

now." (Id. at 13:05-06.)

As the conversation continued, Shumway volunteered that he was reconsidering his initial lack of candor with the officers: "I should've just told them at the beginning that I knew him . . . instead of lying about it." (Id. at 13:07-08.) Rachelle acknowledged that being truthful might be helpful, as it was for their brother in his situation, and that Shumway "might want to think about that." (Id. at 13:08.) She then turned the topic of conversation back to assisting Shumway's wife, who might become suicidal upon the news of his arrest. (Id. at 13:08-09.) Shumway continued to express suicidal thoughts, and Rachelle left him with a few words of encouragement, suggesting he would be okay at the jail, which is operated by good and decent people, and he should "make the best of it." (Id. at 13:10-14.)

At the evidentiary hearing, Rachelle testified that, at the time of her conversation with Shumway in September 2010, she was employed by the Washington County Attorney's Office and assigned to the Civil Division, only occasionally making an appearance on behalf of an attorney in juvenile court but without carrying a criminal caseload of her own. (Transcript of 3/2/2011 Evidentiary Hearing at 80-81.) At no time during their conversation did Shumway ask his sister to represent him or to help him find an attorney. (Id. at 89.)

Detective Adam Olmstead and FBI Special Agent Steve Kleinlein met with Shumway the next morning at the county jail, some twenty-one hours after defendant had spoken with his sister. (Id. at 64-65.) They went to the jail in response to Shumway's request to speak with investigators again. (Id. at 66.) Immediately upon meeting with defendant, Detective Olmstead told Shumway he was aware he had requested an attorney the day before. (Id. at 67.) Detective Olmstead then explained that he and Agent Kleinlein had responded to the jail based on information suggesting that defendant "wanted to reinitiate contact with investigators to talk

-8-

about the case, and just clarified that with him, that it was by his choice that we were there at the jail." (Id.) Shumway confirmed that information, stating that he had spoken with his wife and now wished to talk with investigators again without an attorney present. (Id.)

Agent Kleinlein then provided Shumway with a written Miranda waiver and asked him to read it aloud. (Id. at 68.) After defendant did so, Agent Kleinlein asked if he understood the rights explained therein; Shumway confirmed that he understood his rights and, in the presence of the officers, signed the waiver. (Id. at 68-69.) (Waiver entered in evidence as Plaintiff's Exhibit 2.)

The investigators then interviewed Shumway, who made incriminating statements about his involvement in the robbery of Beehive Credit Union. (Id. at 69.) At the conclusion of the interview, Shumway provided a written statement. (Id. at 70.) In that statement, Shumway admitted to participating in the robbery and to suggesting the idea of committing a robbery to his passenger before they left Las Vegas to come to Utah. (See Plaintiff's Exhibit 3.) Defendant ended his written statement with the sentence, "No one has promised me anything for giving my statement" just above his signature. (Id.) At no time during this interview did Shumway request an attorney, request to terminate the interview, or otherwise suggest that he wished to invoke the rights he had waived–in writing–at the interview's outset. (Transcript of 3/2/2011 Evidentiary Hearing at 71-72.)

Later that same day, Detective Olmstead and Special Agent Footlik returned to the jail and, while there, requested another interview with Shumway. (Id. at 72-73.) After Shumway was brought to them, the investigators explained that they had requested another interview because they had a few more questions for him. (Id. at 73.) Agent Footlik provided defendant with another written Miranda waiver and explained that it was the same form he had signed at

the start of his earlier interview. (Id.) Shumway signed the waiver, although Detective Olmstead noticed that his signature was more hurried than when he signed the first waiver form. (Id. at 73-74.)(Second Waiver entered in evidence as Plaintiff's Exhibit 4.)

During this second jailhouse interview, Shumway made statements regarding the handgun used in the robbery but did not provide a second written statement. (Id. at 76.) At no time during this second interview did Shumway request an attorney, request to terminate the interview, or otherwise suggest that he wished to invoke the rights he had waived in writing twice that day. (Id. at 76.)

On January 21, 2011, defendant filed motions to suppress evidence gathered as a result of the traffic stop and to suppress statements by defendant after he requested an attorney and after spoke with his sister. (File Entry Nos. 43 & 44). On March 2, 2011, the Court held an evidentiary hearing in St. George, Utah, in which the government presented witnesses and exhibits and defendant called one witness. (See Minute Entry 59.). On May 23, 2011, defendant filed a memorandum in support of his motions to suppress (File Entry No. 79), and on June 22, 2011, the government timely filed its response (File Entry No. 82).

## ANALYSIS

### I.   OFFICER LEFEVRE'S INITIAL TRAFFIC STOP WAS LAWFUL.

Defendant asserts that Officer Lefevre's investigatory stop of his vehicle was unsupported by reasonable suspicion and therefore unreasonable under the Fourth Amendment.

"A traffic stop is a seizure within the meaning of the Fourth Amendment." United States v. Botero-Ospina, 71 F.3d 783, 786 (10th Cir. 1995)(en banc). A traffic stop constitutes an investigative detention, and "[t]o determine the reasonableness of an investigative detention,

-10-

[courts] make a dual inquiry, asking first 'whether the officer's action was justified at its

inception,' and second 'whether it was reasonably related in scope to the circumstances which

justified the interference in the first place.'" Id. (quoting Terry v. Ohio, 392 U.S. 1, 20 (1968)).

As to the first part of the inquiry, "it is well settled that an investigative stop is justified

where police officers have 'a reasonable, articulable suspicion that the detainee has been, is, or is

about to be engaged in criminal activity.'" United States v. Elkins, 70 F.3d 81, 83 (10th Cir.

1995)(quoting United States v. Nicholson, 983 F.2d 983, 987 (10th Cir.)). "The presence of

reasonable suspicion is not determined by any one factor, but by the totality of the

circumstances." Id. (citing Alabama v. White, 496 U.S. 325, 330 (1990)).

> As explained by the United States Supreme Court,

> When discussing how reviewing courts should make reasonable-suspicion
> determinations, we have said repeatedly that they must look at the 'totality of the
> circumstances' of each case to see whether the detaining officer has a
> 'particularized and objective basis' for suspecting legal wrongdoing. This process
> allows officers to draw on their own experience and specialized training to make
> inferences from and deductions about the cumulative information available to
> them that might well elude an untrained person. Although an officer's reliance on
> a mere 'hunch' is insufficient to justify a stop, the likelihood of criminal activity
> need not rise to the level required for probable cause, and it falls considerably
> short of satisfying a preponderance of the evidence standard.

United States v. Arvizu, 534 U.S. 266, 273-74, (2002)(citations omitted).

> The Tenth Circuit has further elaborated on the reasonable suspicion standard:

> Reasonable suspicion is a less demanding standard than probable cause not only
> in the sense that reasonable suspicion can be established with information that is
> different in quantity or content than that required to establish probable cause, but
> also in the sense that reasonable suspicion can arise from information that is less
> reliable than that required to show probable cause.

United States v. Tuter, 240 F.3d 1292, 1296 n.2 (10th Cir. 2001)(citing Alabama v. White, 496

U.S. 325, 330 (1990)). And, "as long as [the officer] has a particularized and objective basis for

suspecting an individual may be involved in criminal activity, he may initiate an investigatory

-11-

detention even if it is more likely than not that the individual is <u>not</u> involved in any illegality."

United States v. Johnson, 364 F.3d 1185, 1194 (10th Cir. 2004)(emphasis in original).

In assessing reasonable suspicion, courts must also defer to trained law enforcement

personnel and their "ability to distinguish between innocent and suspicious circumstances."

United States v. Mendez, 118 F.3d 1426, 1431 (10th Cir. 1997).

> The process does not deal with hard certainties, but with probabilities. Long before the law of probabilities was articulated as such, practical people formulated certain common-sense conclusions about human behavior; jurors as fact-finders are permitted to do the same—and so are law enforcement officers. . . . [T]he evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement.

Id. (citing United States v. Cortez, 449 U.S. 411, 418 (1981)). An officer may "draw on [his]

own experience and specialized training to make inferences from and deductions about the

cumulative information available to [him] that might well elude an untrained person." United

States v. Arvizu, 534 U.S. 266, 273 (2002). "The evaluation is made from the perspective of the

reasonable officer, not the reasonable person." United States v. Quintana-Garcia, 343 F.3d 1266,

1270 (10th Cir. 2003)(emphasis original).

Based on the totality of the circumstances, Officer Lefevre possessed reasonable

suspicion (prior to initiating the traffic stop) that Shumway was engaged in criminal activity:

*1. Armed Robbery Suspect Descriptions.* The Tenth Circuit has held that suspects

fleeing the scene of an armed robbery present exigent circumstances calling for action. See

United States v. Miller, 532 F.2d 1335, 1338 (10th Cir. 1976). "The cases hold that a general

description of either the getaway car or the suspects is a sufficient basis for the existence of

probable cause." Id. (citing numerous cases).[3]

---

[3] While the Miller case speaks to probable cause to arrest armed robbery suspects, it is instructive as to the weight given to suspect descriptions and strongly supports the proposition

-12-

Within minutes of the armed robbery radio call, Officer Lefevre observed a vehicle

entering the freeway. He immediately noticed the passenger was a dark-skinned male wearing a

dark-colored shirt and the driver was a white male wearing a white shirt with some sort of

discoloration on the front. Both occupants matched, in some way, the suspect descriptions.

Dispatch advised that the suspect was a dark-skinned male in a blue plaid shirt or a white shirt

with possible discoloration from the exploding dye pack. Additionally, the vehicle reached

Officer Lefevre's location at a time consistent with travel time from the scene of the robbery to

the on-ramp. The officer's observation of subjects matching the description of an armed robbery

suspect is sufficient, without more, to establish reasonable suspicion justifying an investigatory

detention. Officer Lefevre testified, however, of additional observations that supported–and

strengthened–his suspicion that the defendant or his passenger may have been involved in

criminal activity.

*2. Excessive Nervousness.* Having his attention drawn to defendant's vehicle, Officer

Lefevre focused intently on its occupants, observing their reactions to his presence. They

appeared nervous, with mouths open and eyes focused on Officer Lefevre in a prolonged stare

that differed significantly from reactions to a police car by the general motoring public.

Although the Tenth Circuit has held that nervousness is "of limited significance" when

determining if reasonable suspicion exists, nervousness that does not dissipate over time is

entitled to more weight and need not be ignored in the reasonable suspicion calculus. United

States v. Williams, 271 F.3d 1262, 1268-69 (10th Cir. 2001)(citations omitted). "[N]ervousness,

_____

that even a general suspect description in an armed robbery provides sufficient reasonable
suspicion to detain persons matching the given description. See also United States v. Breedlove,
444 F.2d 422, 424 (5th Cir. 1971)(armed robbery suspects fleeing to avoid police weighs heavily
in Fourth Amendment reasonableness determination).

even if it may be a normal reaction, is still among the pertinent factors a reasonable law enforcement officer would analyze in investigating possible crimes, and should not be completely disregarded." United States v. Johnson, 364 F.3d 1185, 1192 (10th Cir. 2004).

Officer Lefevre noted the unusually nervous reaction by Shumway and his passenger and elected to follow Shumway's vehicle. Both occupants remained fixated on the officer's presence as he followed their car. Their behavior was highly unusual in the officer's experience; Shumway checked his mirrors constantly while the passenger physically turned his head and looked over his shoulder at Officer Lefevre every few seconds. Officer Lefevre testified that both occupants displayed paranoia at his presence and reacted much differently than most people who note his presence behind their vehicles. This excessive nervousness, which continued as Officer Lefevre followed defendant's vehicle, cannot be entirely disregarded because it properly contributed to the establishment of reasonable suspicion—particularly when exhibited by subjects matching the descriptions of an armed robbery suspect.

In his memorandum, Shumway asserts that Officer Lefevre's testimony was contradictory because he viewed with suspicion both the occupants' looking at him and their looking away. (Doc. 79 at 19). Officer Lefevre testified consistently, however. Initially, he noted the car's occupants reacted to police presence with a "long, cold, hard stare" that was highly unusual; the officer then watched the subjects awkwardly look away and stare directly ahead, as if attempting to undo the effects of their jaw-dropping stare. In other words, Shumway and his passenger appeared surprised and alarmed by the officer's presence and then, in a rather obvious fashion, attempted—unconvincingly—to act nonchalant. As Officer Lefevre followed the car, the occupants' paranoia promptly resumed. This sequence of unusual, nervous behavior caught the attention of the officer and, considered as a whole, reasonably contributed to his suspicions of

-14-

criminal activity. Considering the occupants' nervous behavior as a whole and in context, the Court finds they support a finding of reasonable suspicion justifying the traffic stop.

Notably, Shumway himself corroborated Officer Lefevre's suspicions about the passenger's behavior. When assisting officers were frisking the passenger, Shumway whispered to Officer Lefevre, "This guy must have done something wrong, he's acting really weird." (Transcript of 3/2/2011 Evidentiary Hearing at 30.) While Shumway's statement did not occur until after he had been detained, it strongly corroborates Officer Lefevre's pre-stop observations that the co-defendant passenger's nervous behavior was highly unusual–and suspicious.

*3. Suspicious Movements.* Furtive movements and nervousness by a suspect contribute to reasonable suspicion. United States v. DeJear, 552 F.3d 1196, 1200-02 (10th Cir. 2009)(citing United States v. Bullock, 510 F.3d 342, 348 (D.C. Cir. 2007)(stating that "'furtive' gestures in response to the presence of police can serve as the basis of an officer's reasonable suspicion")). While following Shumway's vehicle, Officer Lefevre observed the dark-skinned passenger remove his dark-colored shirt and discard it in the backseat. This action occurred after the occupants had fixated on the officer and appeared to be a response to his continued presence. Officer Lefevre found this movement highly suspicious and suggestive of an effort by the passenger to distance himself from the very article of clothing most likely to result in his detection and apprehension.

Considered in their totality, these factors combined to give Officer Lefevre, in light of his training and experience, reasonable suspicion to believe defendant was engaged in illegal activity. He observed subjects–leaving town on an interstate–whose appearances were consistent with armed robbery suspect descriptions and whose behavior was unusual and highly suspicious. Officer Lefevre drew common-sense conclusions; he was not required to ignore his observations

-15-

under the circumstances. In fact, given the nature and severity of the crime and his personal observations, Officer Lefevre had a duty to investigate promptly. See Miller, 532 F.2d at 1338; see also Terry v. Ohio, 392 U.S. 1, 23 (1968)(court suggests it would have been poor police work to not investigate further upon observing potential robbery suspect).

"The touchstone of the Fourth Amendment is reasonableness, and the reasonableness of a search is determined 'by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'" United States v. Knights, 534 U.S. 112, 118-19 (2001)(quoting Wyoming v. Houghton, 526 U.S. 295, 300 (1999)). "The Fourth Amendment does not require police officers to close their eyes to suspicious circumstances," and Officer Lefevre's inquiry about the suspects' travels "accounted for but a moment of defendant's brief detention and was based upon specific and articulable facts and rational inferences." United States v. Espinosa, 782 F.2d 888, 891 (10th Cir. 1986)(differentiating between brief investigatory stops and more intrusive seizures resulting from arrests). There was nothing unreasonable–or unconstitutional–about the officer's decision to briefly detain defendant to investigate whether he or his passenger had been involved in such a violent offense occurring just minutes earlier. See United States v. Breedlove, 444 F.2d 422, 424 (5th Cir. 1971)(armed robbery suspects fleeing to avoid police weighs heavily in reasonableness determination); Miller, 532 F.2d at 1338.

## II.    DEFENDANT'S STATEMENTS TO HIS SISTER AT THE POLICE STATION WERE NOT OBTAINED IN VIOLATION OF MIRANDA.

Defendant also claims all statements made subsequent to his request for an attorney must be suppressed because officers "[b]ecause the government failed to use proper procedural safeguards effective to secure Defendant's Fifth Amendment privilege against self incrimination" and because subsequent written waivers by defendant "were tainted by the prior illegality of

-16-

meeting with Defendant's sister." (Doc. 79 at 23-24.).

Miranda "stands for the well-known proposition that a suspect in custody has a constitutional right under the Fifth Amendment to remain silent." United States v. Alexander, 447 F.3d 1290, 1294 (10th Cir. 2006). And, although Miranda provides for certain procedural safeguards regarding custodial interrogation, "two requirements must be met before Miranda is applicable: the suspect must be in 'custody,' and the questioning must meet the legal definition of 'interrogation.'" United States v. Perdue, 8 F.3d 1455, 1463 (10th Cir. 1993).

With respect to the first requirement, "the ultimate inquiry is simply whether there is a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983)(quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977)). The government conceded that defendant was in "custody" for purposes of Miranda at the time of his conversation with his sister, Deputy Washington County Attorney Rachelle Elhert.

With respect to the second requirement, custodial interrogation means, "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Miranda v. Arizona, 384 U.S. 436, 444 (1966)(emphasis added). However, "[a]n accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communications, exchanges, or conversations with the police." United States v. Bautista, 145 F.3d 1140, 1146-47 (10th Cir. 1998)(quoting Edwards v. Arizona, 451 U.S. 477, 484-85 (1981)). In other words, even after invoking his right to counsel, an in-custody defendant remains free to engage in further communications or conversations–even with police–so long as he initiates such

-17-

conversations.

Defendant asserts that police obtained his statements in violation of Miranda because they were involuntary. He cites United States v. Rith, in which the Tenth Circuit explained the voluntariness of a defendant's statements "must be assessed from the totality of the circumstances, looking both at the characteristics of the defendant and the details of the interrogation." 164 F.3d 1323, 1333 (10th Cir. 1999)(citing Schneckloth v. Bustamonte, 412 U.S. 218, 226 (1973)). The Rith court continued,

> The essence of voluntariness is whether the government obtained the statements by physical or psychological coercion such that the defendant's will was overborne. Five factors are considered: (1) the age, intelligence, and education of the defendant; (2) the length of any detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of his or her constitutional rights; and (5) whether the defendant was subjected to physical punishment.

Id. (citations and quotations omitted).

When analyzed according to the factors in Rith, Shumway's claim of involuntariness fails. First, Shumway is a middle-aged man who has presented no evidence of lack of intelligence or education to a degree that would make him particularly susceptible to coercion. Second, Shumway's detention was brief–approximately ninety minutes.[4] Third, Shumway was questioned by investigators in a reasonable manner for approximately ten minutes. Fourth, officers advised Shumway of his constitutional rights twice (verbally) on the day of arrest and twice (in writing) the following day. Finally, there is no evidence whatsoever before the Court suggesting authorities applied physical punishment or coercion.

Defendant further ignores the absence of a government-agent relationship between police

---

[4] The traffic stop occurred a little past 11:00 a.m., see Transcript of 3/2/2011 Evidentiary Hearing at 11, and, according to the time stamp on the video recording, Shumway's police station interrogation began at approximately 12:15pm and lasted roughly ten minutes. See Pl. Ex. 1-A at 12:15 – 12:25.

-18-

and defendant's sister, despite her employment. "An agency relationship does not develop where the government is an incidental beneficiary of another party's actions, even where the government admittedly facilitates the conversation that leads to the suspect's decision to reinitiate questioning." United States v. Alexander, 447 F.3d 1290, 1297 (10th Cir. 2006)(emphasis added); see also United States v. Gaddy, 894 F.2d 1307, 1311 (11th Cir. 1990)(finding no agency relationship when suspect's aunt, who was a police officer, persuaded suspect to confess but was not acting at direction of her superiors but out of concern for her nephew); Arizona v. Mauro, 481 U.S. 520, 528 (1987)(conversation between suspect and his wife in presence of police officer and recorded did not constitute Miranda violation since the Court "doubt[ed] that a suspect, told by officers that his wife will be allowed to speak to him, would feel that he was being coerced to incriminate himself in any way."); Snethen v. Nix, 885 F.2d 456, 459-60 (8th Cir. 1989)(no Miranda violation where suspect's mother persuaded suspect to confess because "[i]t was 'coercion' by [suspect's] mother that led to [the suspect's] inculpatory remarks, not by the police.").

Clearly, the conversation between Shumway and his sister did not constitute police interrogation. Although the conversation took place at the police station and was facilitated by the government, such factors are insufficient to establish a government-agent relationship between police and Ms. Elhert, particularly when the conversation occurred at defendant's asking. See Alexander, 447 F.3d at 1297.

After being handcuffed, Shumway was advised of his Miranda rights by Detective Wilson while still at the scene of the traffic stop. Shumway waived those rights but gave evasive and unresponsive answers in his brief roadside interview. He was then transported to the police station, advised again of his rights by Detective Wilson, and asked to speak with an attorney or

-19-

with his sister.[5] As officers terminated the interview, Agent Footlik advised Shumway that the interview could resume if defendant requested to speak again with officers. Shumway promptly requested to speak further; the interview briefly resumed before defendant again requested an attorney. Officers promptly terminated the interview, speaking with Shumway for approximately ten minutes total.

Just minutes later, Captain Barry Golding contacted Shumway and asked if he wished to speak with his sister, Rachelle Elhert. Shumway affirmed that he wished to speak with his sister and, after being cautioned that she was not able to represent him, defendant replied, "Right, and I don't want her to represent me." Captain Golding asked further, "You just want to talk to her?" and Shumway replied, "Yeah." Captain Golding confirmed Shumway requested a lawyer; his conversation with defendant lasts approximately one minute.

Ms. Elhert arrived at the police station and entered the interview room. In the first two minutes of conversation, Shumway's sister suggested that he not tell her about the crime and told him that their conversation was being recorded. Shumway persisted in making incriminating statements despite his sister's warnings and despite telling Captain Golding, prior to meeting with his sister, that he did not want her to represent him and that he only wished to talk with her. Shumway never asked his sister to represent him nor to assist him in hiring an attorney, and Ms. Elhert's suggestion that Shumway might find being truthful beneficial came only after defendant's acknowledgment that "I should've just told them at the beginning that I knew him . .

---

[5] See note 2, supra. Although Detective Wilson made one statement that would not result in admissible evidence had Shumway replied with an incriminating response, Shumway did not provide an incriminating response. Therefore, there is no statement by defendant to which the exclusionary rule can or should be applied. And, as shown in Part III below, defendant's statements obtained the following day came after he requested to engage in further conversation with authorities and after he acknowledged and waived his rights in writing.

-20-

. instead of lying about it."[6] Defendant now claims illegal police interrogation, government coercion, and involuntariness resulted from authorities honoring his request to speak with his sister–wholly meritless claims.

### III. DEFENDANT'S STATEMENTS THE DAY AFTER HIS ARREST WERE PROPERLY OBTAINED ONLY AFTER DEFENDANT INITIATED POLICE CONTACT AND WAIVED HIS MIRANDA RIGHTS.

"To establish a waiver of the Fifth Amendment rights, the government must show (1) that the waiver was voluntary in the sense that it was a product of free and deliberate choice rather than intimidation, coercion, or deception; and (2) that the waiver was made in full awareness of the nature of the right being waived and the consequences of waiving. Only if the totality of the circumstances surrounding the interrogation shows both an uncoerced choice and the requisite level of comprehension can a waiver be effective." United States v. Hernandez, 93 F.3d 1493, 1501 (10th Cir. 1996)(citing Colorado v. Connelly, 479 U.S. 157, 168 (1986) and United States v. March, 999 F. 2d 456, 460 (10th Cir.1993)).

There is no evidence whatsoever of intimidation, coercion, or deception regarding defendant's waiver of his constitutional rights twice on September 23, 2010–each time in writing. The evidence demonstrates, rather, that Shumway knew and understood his rights enough to request an attorney at least twice on the day of his arrest.[7] When contacted on the

---

[6] Ms. Elhert's suggestion also came only after her initial suggestion that defendant not talk about the incident and after reminders that their conversation was being recorded.

[7] Shumway's second request for an attorney came after he requested the opportunity to continue his interview. Officers prepared to terminate the interview because of defendant's initial request to speak with a lawyer, but Shumway clarified he wished to resume the conversation without an attorney present. He then renewed his request for counsel and officers promptly terminated the interrogation. Shumway was contacted by police again the following day, but only because he requested additional conversation with investigators. This "invocation–waiver–invocation–waiver" sequence demonstrates Shumway's clear understanding of his constitutional rights–and of his ability to waive those rights if he wished to initiate additional conversation with authorities.

morning after his arrest, Shumway affirmed to Detective Olmstead that he requested to speak
with police further—without an attorney present—after talking with his wife.[8] FBI Agent Kleinlein
then provided Shumway with a written waiver and requested he read it aloud. Defendant
complied and signed the waiver before the interview proceeded. At the conclusion of the
interview, Shumway voluntarily provided a signed, written statement implicating himself in the
robbery and ending with the assurance, "No one has promised me anything for giving my
statement."

Later that same day, Detective Olmstead returned to the jail with Agent Footlik. They
requested another interview with Shumway, and Shumway again signed a written waiver of his
constitutional rights before being questioned. During this second interview, defendant made
additional incriminating statements, particularly concerning the handgun used in the robbery.

At no time during either interview on September 23, 2010, did Shumway request an
attorney, request to terminate questioning, or otherwise express a desire to invoke his right to
counsel. All evidence before the Court points to the voluntary nature of Shumway's written
waivers and subsequent interviews.

In his memorandum, defendant suggests that his jailhouse interviews the day after his
arrest were involuntary "because those waivers were tainted by the prior illegality of meeting

---

[8] There is no evidence Shumway made mention of his prior meeting with his sister or
otherwise suggested that his request for an additional interview without an attorney present was
based—to any degree whatsoever—on advice received from Ms. Elhert on the day of defendant's
arrest. Even if Shumway believed his sister's suggestion to consider being honest was somehow
coercive, such perceived "coercion" came from a family member, not police. See Snethen v.
Nix, 885 F.2d 456, 459-60 (8th Cir. 1989)(no Miranda violation where suspect's mother
persuade suspect to confess because "[i]t was 'coercion' by [suspect's] mother that led to [the
suspect's] inculpatory remarks, not by the police."). The same is true of any pressure or coercion
Shumway may have experienced during conversations with his wife.

-22-

with Defendant's sister" who had improperly advised him to confess. As demonstrated in Part II above, however, Shumway's conversation with Ms. Elhert was not the product of coercion or deception and Ms. Elhert did not act as a government agent when meeting with Shumway. The conversation, although it was recorded and took place at the police station, was voluntary in nature. Law enforcement merely facilitated the meeting after Shumway requested to talk with his sister–and expressly acknowledged that she could not (nor did he want her to) represent him in the pending case.

Moreover, Shumway's written waivers were obtained the day after his arrest–after he had time to consider his predicament, consult with his wife, and wait for investigators to respond to his request for additional conversation. Nevertheless, defendant asks the Court to ignore strong evidence of voluntariness and to find coercion where no evidence of coercion exists. Indeed, Shumway's circumstances demonstrate the very hallmarks of voluntariness and deliberate choice. Therefore, Shumway's assertions of coercion and involuntariness must fail.

## RECOMMENDATION

Based on the foregoing analysis, **IT IS HEREBY RECOMMENDED** that Defendant's Motions to Suppress Evidence and Statements (File Entry Nos. 43 & 44) be **DENIED.**

Copies of the foregoing report and recommendation are being mailed to the parties who are hereby noticed of their right to object to the same. The parties are further notified that they must file any objections to the report and recommendation, with the clerk of the district court, pursuant to 28 U.S.C. Section 636(b), within ten (10) days after receiving it. Failure to file

-23-

objections to both factual and legal findings may constitute a waiver of those objections on subsequent appellate review.

DATED this ___5___ day of ___July___ of 2011.

BY THE COURT:

**ROBERT T. BRAITHWAITE**
**United States Magistrate Judge**